Good morning. May it please the Court, I'm Joe Josephson for Helen Smith. Your Honor... We have some preliminary orders that were issued. Maybe you can clarify your position as to the orders we issued relative to... You filed an Anders brief. Yes, sir. And we issued an order that asked that you file a motion to withdraw. Yes. Did she serve a copy of the order, a copy of the Anders brief, and a copy of the motion to withdraw on your client? Yes. Our records don't show that that was entirely done, but I'm not sure. It was done on June 22nd. I think our papers in the certificate of service show that that was done the day after. Did she get a copy of the order, which indicates she has the right to file a pro se brief? Our order? Yes, I believe so, because our certificate is so indicated. Maybe... which was this, your certificate on what day now? I think June 22nd. June 22nd, we certify that it was sent by mail to her in Texas. All right, we'd have to check that. So as far as the record shows, then, Ms. Smith has received all the documents, and she would have had, depending on when she received it, the 22 days to file her brief. Yes, sir. Have you seen one? I haven't seen one. No, and we have no word from her at all, so I don't know what her position is. I note that in the two cases which I was asked to review, the Hamline case and the other case, the Moreno-Hernandez, it would appear that if there is a remand to the district court, Mrs. Smith and the other defendants can opt out of the process. So I think, frankly, she would have to consider seriously whether there would be any benefit to her in a remanded process. We have been routinely issuing orders asking those folks that are subject to this whether they want to get into the process or not, because it's their choice. And as the court knows, in this case, her trial counsel, Mr. Diani, filed a lengthy sentencing memorandum when he was confronted with a pre-sentence report calculating a sentencing range of 51 to 63 months. He challenged all of the proposed upward adjustments and concluded that the proper base offense level was 17 with a sentencing range of 24 to 30 months. And then at Excerpt 47, the district court sentenced Mrs. Smith to a term of 24 months at the low end of the range recommended by her counsel. It was in light of those facts and the possibility that a collateral attack could conceivably result in an increased sentence that we submitted our Anders brief. Now, looking at the Aveline case, my first impression was really a question as to whether, under those facts, there could have been any plain error which would trigger a limited remand at all. There didn't seem to be any constitutional error. And if what was meant by an unpreserved Booker error was a constitutional error that did not seem to be present. Looking at Moreno-Hernandez, when the court spoke of a remand to involve unpreserved Booker error, whether constitutional or not constitutional, it may be that a limited remand must be made. But as I just noted, in that event, we would have an opportunity to consult with Mrs. Smith and advise her as to whether she would gain anything by that process. And I won't say what my advice would be, but on this record, I would say that that would be a very serious consideration for her to take. Well, you're still counsel of record for her. And since all of our orders have gone out and since she's received them, you've had no communication with her. No, I haven't. But I'm not recognizing that she has the option of telling the district court that she doesn't want the benefit of a remand process. I'm not particularly disturbed about that. I would certainly pledge to the court that we would consult with her and advise her and then let her decide. Well, just speaking for myself, I'm a little concerned because of the Anders requirements. Until we know whether or not she actually received the order and has decided not to file a brief, we're kind of in a dead spot with regard to your motion to withdraw. I can maybe help because I think that given these two cases, that motion should be withdrawn or held in abeyance so she has benefit of counsel as she determined would like to do. Yeah, because it's kind of hard to let you go. We have no idea. And she has a right under Anders that has to be fulfilled or else we're going to be back here on habeas. I understand. I have nothing further unless the court has other questions. Thank you. Good morning, Your Honors. May it please the court. I'm Allison Mendel for Defendant Leroy's Bruges. With respect to the initial question, did I do what the court told me to? The answer is no. I didn't hear that. I'm sorry. I'm not I'm not questioning. I just didn't hear it. I did not do what the court told me to do. When the order came out that we file the motion to withdraw in addition to serving the Andrews brief on my client and to serve the copy of the order on my client, I erroneously assumed that in accordance with the practice of my office to immediately send out all orders that come in and out to the clients even before they come to the attorney. I assumed it was done. It was not done, which I didn't notice until I got the order from this court saying show up and explain why you didn't do it. And then I went back and reviewed it. And, in fact, it was not sent out. However, I'm in somewhat of a different position than Mr. Josephson because I have had many conversations with my client. My client did know that he would have the right to submit a pro per brief. What he probably didn't know in a timely manner was when it was due. I did send the order as soon as I got this court's order explaining to him when the brief was due. But I have been he has been asking me and I have been sending him parts of the record ever since I was appointed in this matter. I also discussed the case with him after I filed my Andrews brief. He instructed me that I should not pursue and he was not going to pursue remand for resentencing. Excuse me. He did not want to pursue resentencing? Correct. And how about in light of the new cases? We were discussing Ameline when we had that discussion. Okay. The latest version of Ameline is to say there was a pre-judge panel Ameline. Right. Beyond Ameline. I didn't discuss with him Moreno-Hernandez. Clearly he didn't have any Sixth Amendment errors in his sentencing. He didn't have any upward departures. There were no factual disputes underlying any upward departures. None of that would apply. But we specifically discussed remand for resentencing and he specifically instructed me that he wasn't going to pursue that and I shouldn't pursue it. So the issue on which he would have submitted appropriate brief if he was going to would have been the merits. There's nothing formally in the case though filed that he has decided to waive remand. Will that be done? Well, if I'm still his counsel then yes I will do it. Because I filed the Anders brief and moved to withdraw it and I thought he was filing appropriate brief because he had expressed an intention to do so and as I said we've been sending him parts of the record as he requested it over a period of several months. We haven't granted the motion to withdraw. No, I understand that and if I remain his counsel of record I'll withdraw the sentence appeal. I will attempt to talk to him again. I've tried to contact him but that takes time. And I will make sure that that's what he wants me to do. But those were my instructions after I filed the Anders brief. I think it would be appropriate to have that on the record because that would help us get forward. Yes. At least for that issue. No, I completely agree, Your Honor, and had I known that I didn't comply with this court's order I would have attempted earlier to start trying to contact him so I would have talked to him and been allowed to withdraw the sentence appeal. Okay. Thank you. May it please the Court, my name is Meredith Ahern and I'm here on behalf of Kenneth Smith, the third co-defendant in this case. I'm, I guess, a little out of step today because I did not file an Anders brief. I'm actually going on the merits here. Mr. Smith came to know Mrs. Smith and Mr. Sprush in 1998 which was a number of years after these two co-defendants had been apparently trying to hide assets, move assets around, or fail to pay the taxes which they should have paid. Mr. Smith was charged with two counts in this indictment, a conspiracy count and an aiding and abetting count. He was found guilty on the conspiracy count and not guilty on the other count which is a somewhat interesting conclusion by the jury. Mr. Smith originally filed a motion to sever his trial from that of his co-defendants. Mr. Smith's co-defendants were, I guess, what we term tax protesters and had some very novel and unconditional views about who had to pay taxes and why they didn't. There was no evidence that Mr. Smith shared these views. The court, during the course of the trial, gave a number of cautionary instructions, I think attempting to help the jury separate Mr. Smith's case, the evidence that went to him from the evidence that went to his co-defendants. By far the vast majority of evidence was evidence against his co-defendants. There was expert testimony, of course, about what they owed in taxes and how the assets had been moved around. We're submitting that there were markedly different degrees of culpability between Mr. Smith and his co-defendants and that Mr. Smith's case should have been severed from that of his co-defendants. Although there are not a number of cases in the case law on severance because it comes up after the trial has already occurred, I did cite a few cases in my brief and will rely on those. May I kind of clear my mind on this issue? It seems to me after the other defendants had completed some financial transaction with regard to laundromat and all that stuff, did they then get hooked up with your client and your client provided the so-called trust structure to use the money that had been accumulated by the other defendants and move them about the trust system that they'd set up. So at that point he was fully involved with the other defendants using the money that they had obtained through their various means before and putting them through this trust situation. Am I correct? That's basically correct, Your Honor. He was involved in, I believe, the purchase of some gold through another company. His explanation or the explanation for that was that this had to do with Y2K concerns. Yes. That sort of thing. And he was involved with some laundromat proceeds, I believe, that went into some trust. And they're fully involved in moving checks around between trusts and things, fully involved with the other two defendants doing that. It's my understanding that he had some involvement in the trusts. Whether or not he knew the purpose of moving this money around or knew that the co-defendants, in fact, did owe taxes is unclear to me. But he selected the people to be the trustees and the people to sign the checks. I believe that's correct. The mechanism, I think. There were mechanisms set up, a number of trusts. I can't recall the names of all of them. Candu Investments and some other trusts, some of which he was involved in, many of which he was not. But, yes, he did purchase some gold and, I believe, transfer some monies that had to do with the sale of the laundromat, in fact. Yes. He, however, Mr. Spresh testified at his trial that Mr. Smith had nothing to do with his taxes, that he did not go to him for tax advice, did not discuss his tax situation with Mr. Smith, and, in fact, sought tax advice from another group with which Mr. Smith was not affiliated. As I understand it, though, your client, Mr. Smith, made it clear to those around him that he did not have a Social Security number and that he used trusts so that he didn't have to deal with taxes. I mean, the whole purpose of this education in trusts was so that you didn't have to pay taxes. Mr. Smith, I believe, there was some evidence that he did not have a Social Security number. There was no evidence that he himself was evading taxes or that he owed any taxes. He, I believe, we could say, safely was probably sympathetic to the defendant's position. I'm not sure that's sufficient to hold him liable, but there was evidence that he also had some, I guess, not mainstream views about trusts and taxes, et cetera, that probably all of us don't subscribe to. Yes, I think at best we could say that he was sympathetic. The judge in this case, when Mr. Smith's counsel ruled for judgment of acquittal, let the case go to the jury but did note that he believed that the evidence against Mr. Smith was very slight. Mr. Smith received a guideline sentence. Based on relevant conduct, he was ordered to pay $70,000 in taxes, which I guess were Mrs. Smith's taxes jointly and separately with the other codependents, and he did receive a two-point upward enhancement for participating in a, quote, sophisticated scheme, unquote. Mr. Smith raised sentencing issues under the guidelines. At the time his brief was written, Booker had not been published, and the latest Ameline case, of course, had not been. Should your case be remanded? Yes, sir. We believe that your Honor, our case should be remanded for resentencing. It sounds like you've got a Sixth Amendment. Yes, we believe that's a Sixth Amendment issue. I'll take whatever time I have left for rebuttal.  You've got about three minutes. Okay. May it please the Court? My name is Karen Quinnell, appearing on behalf of the United States. With me at counsel table I have the criminal chief of the U.S. Attorney's Office and the prosecutor in this case, Tom Bradley, and a summer law intern in our office, Jeremy Engel. Would the Court like me to begin by addressing Leroy Sprush and Helen Smith or by the Ken Smith issues? Your choice, but maybe we should do it in Leroy, which we heard from them. Okay. As to Helen Smith, I think the Court has recognized that it's in a bit of a difficult position because we are not sure what she would want to do. And under Ameline 3, the inmate decision, the first question is, does the defendant wish to have review? Why don't I assume for purposes of this argument that she does, and then we can address the second issue. Well, actually, in her Anders brief, her counsel basically said that she didn't really want to have the case remanded, although she was discussing Booker or Ameline, because there was a reasonable possibility that if there was a remand, she might be subject to a higher sentence on remand. In this case, as to Helen and Leroy, their base offense level was determined on a stipulated amount of tax loss. Actually, the government agreed to a more conservative figure than it had asked for in the pre-sentence investigation report, and the District Court refused to impose any of the enhancements. So a decision by Helen or Leroy to opt out of an Ameline remand would be reasonable. If they decided that they wanted to opt in and ask for a remand, the record in this case as to Helen and Leroy, similar to the record in Ameline, I believe leads the court to a dead end, and as to Helen and Leroy only, the case would need to be remanded to give the District Court an opportunity to state whether to sentence. So I think I can maybe save us some time. So the real question is what do they want to do? Correct. If they want a remand, they get it. If they don't, they don't. That's correct. And I don't think I need to hear from you on that question. All right. As to Ken Smith, the District Court properly denied the defendant's motion for severance. The evidence was not difficult for the jury to compartmentalize. The court was very cautious in giving limiting instructions, both before trial, during trial, and in its charge to the jury, that the jury needed to give separate consideration to each defendant, decide which piece of evidence was relevant to each defendant, and consider only that evidence when determining the guilt or innocence of that defendant. And the jury returned selective verdicts, acquitting Mr. Smith of aiding and assisting in the evasion and convicting him on the conspiracy count. So clearly the jury was not swayed by the alleged evidence that Ken Smith claims was prejudicial to convict him on all counts. And Ken Smith has not established that the District Court's error was that the District Court erred at all, and he did not establish that he was denied a fair trial, that the District Court would have been required to exercise its discretion only one way, by granting him severance. So the District Court properly denied that motion. I have to say that I disagree with one thing that you said, and I may be paraphrasing it incorrectly, but I think you told us that the jury made it clear by its decision that it was not influenced, I think your word was swayed, by the evidence as against the other defendants. I'm not sure that's right, but I don't think that's knowable. But that's also not the test. Right. What we can know is that the jury went through the evidence as it was instructed, which we are necessarily to assume it did, separated out the evidence that was relevant to the defendants, and considered that evidence as to each defendant. Now, Ken Smith argues that there was irrelevant evidence that was admitted at trial. There was evidence that was not relevant to him. The risk from evidence that's clearly not relevant to a defendant is fairly minimal, and the District Court did carefully give cautionary instructions. Also, the defendant says that there was evidence of his co-defendant's radical tax protester briefs. Well, as the court pointed out, Ken Smith had some rather radical protester briefs, which he was happy to talk to almost anybody about on almost any occasion that he saw them. In your best posture, what was the tax discussions, trusts, et cetera, between the two defendants and Ken Smith that we discussed earlier with counsel that would implicate him on his conviction? Ken Smith told Leroy Sprush, if you're going to set up these trusts, don't use your name. So Leroy and Helen would make up names and spell things backwards, for example, Yorel and Ohadi. Then Ken Smith participated in a number of transactions, and indeed the structure of those transactions are the strongest evidence of the intent of Ken Smith and the parties. When you look at, for example, the purchase of the money from the gold mine, first Leroy purchases a check from the credit union payable to Ken Smith's trust, Westwind. Then Ken Smith takes that money and using the name of Hungry Bear Mining, his mining company, buys the gold and silver, gives the gold and silver to Helen and Leroy. In another situation, Leroy buys a cashier's check payable to Yorel, his trust company. That money is deposited into the Westwind account. Ken Smith takes that money and uses a check for $14,500 to pay automated equipment for the purchase of a hydro extractor for the Wash Day laundromat. The other part of the, that was a cashier's check for about $34,000. The other portion of that money is used by, Ken Smith gives to Helen. Helen uses that money to purchase a note at a discount from her daughter for $15,000. And Your Honor, we detail all of these transactions in our brief about page six through eight. Also, there was evidence in the record that Ken Smith told anyone and everyone that would listen, I don't have a social security number. And because of that, I'm the last free man on earth. I don't have to pay taxes. And I don't because I don't have to. I'm outside the system. Did that answer your question? Finally, on the sentencing issue, in this case, we're not left at the dead end that the court is in Ameline and in Sprush and Smith. When sentencing Ken Smith, the district court granted him a two-level downward departure on the ground that he had a sick wife that needed an operation and care from Ken Smith. But the court downward departed only two levels, stating that I won't depart any further than that, because to depart any further would undermine the significance of Mr. Smith's conduct and violate the statute, which says we've got to look in sentencing to deterrence of self, deterrence of others, affirmation of community norms, retribution, and so on. And the court explained that he believed that this was an offense, a serious offense, that required a prison sentence. The court pointed out that it did not believe that Ken Smith was, and I quote, at all contrite. He also said, the district judge also said, that deterrence of others is important because there's people that can fall into these situations. And he said, I think that an affirmation of community norms is important because I think it's important to communicate to everyone that the court is not going to allow them to not pay their taxes and then be overly lenient with them. How is this relevant to our decision? It indicates that had the court known that the guidelines were advisory, it would not have rendered any lower a sentence than it already did. And so we shouldn't follow the Ameline procedure? You can follow the Ameline procedure. Ameline, two questions in Ameline. First, does the defendant want the relief? Yes, the defendant does want the relief. Second question is, you have to look to the plain error test. Was there error? Yes, there was error. Was it plain? Yes, there was. There's two other things that the court needs to consider, though. Was there harm to his substantial rights? And in order to show that, he needs to show a reasonable probability that the sentence would have been different. Well, as I read Ameline, and maybe I'm misreading the case, in order to determine that, we ask the district judge. I believe that you are misreading that part of the case, Your Honor, because Ameline says, if an eligible party seeks resentencing under Booker-Fan-Fan, we will then engage in plain error analysis. We don't immediately send it back to the district court. If that analysis leads the panel to the same dead end that we reach here, on the record in Ameline, there was no indication whatsoever what the court thought about the sentence, why it imposed the sentence, whether it would have given a lower sentence. If that analysis leads the panel to the same dead end that we reach here, where it's not possible to reliably determine from the record whether the sentence imposed would have been materially different, had the district court known that the guidelines were advisory, we will remand to the court for him to answer that question. In our case, we have an indication. And from your view, then, that we can reliably determine? We can reliably determine, because the district court, when it was discussing these factors, was specifically discussing the 3553A factors, and said, I'm looking at these factors. I can't give you any lower a sentence and still meet the requirements of those factors. And those are the exact factors that the court, after Booker, said that courts are allowed to look at in addition to the guidelines. Allowed but not required. I believe the court has to consider the 3553A factors. And must consider the sentencing guidelines. Does not need to follow the sentencing guidelines. Does the court have any further questions? I don't think so. Thank you, Your Honor. I have just a few comments. Number one, I think it's important to note that all of the trusts that we're talking about today, Mr. Smith did not set up those trusts. He was involved in some of them, and some of them were set up by other people. But he was not in the business of actually setting up trusts himself. With regard to the URL trust that was mentioned, the money was used for legitimate purposes. It was used for purchasing equipment for the laundromat. Part of it was used by Helen Smith. Mr. Smith didn't have any idea, perhaps, what she was doing it. Part of it was actually used to pay Matanuska-Sisitnaburo taxes that were due from the Smiths. Mr. Smith is not on trial here for his failure to pay taxes, and I think it's prejudicial to him to tar him with the same brush. Mr. Smith's tax situation is not known to this jury. Personally, and this isn't on the record, it appears to me that he didn't pay taxes because he didn't make any money, but I don't think that that is actually in the record. Mr. Smith received his sentence, and he did receive a two-level departure because he has a very ill wife, but he also is required to pay a substantial amount of money in restitution for taxes which were assessed against his co-defendants. And for that reason, he is requesting that this Court remand his sentence. Okay. Thank you very much. Well, I think we're in the process of straightening everything out, and we appreciate your appearance and your arguments. The case of the United States v. Smith et al. is now submitted for decision. The next case on the argument calendar is Alaska's Right to Life Committee v. Miles.
judges: Goodwin, Brunetti, W. Fletcher